# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Newport News Division

AMANDA BROMWELL,

    Plaintiff,

v.                                CIVIL ACTION NO. 4:17cv60

JOSHUA PANKOKE,

    Defendant.

## OPINION AND ORDER

In this action brought by Amanda Bromwell alleging personal injuries and constitutional violations, the Defendant, Joshua Pankoke,[1] a police officer employed with the Police Department for the City of Poquoson, Virginia, moved for summary judgment on the grounds of qualified immunity. (ECF No. 15). Pankoke argues the evidence is insufficient to permit a reasonable juror to conclude he used excessive force while arresting Bromwell on destruction of property charges. See Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") (ECF No. 16). Bromwell filed a brief opposing summary judgment. (ECF No. 17).

After reviewing the exhibits and testimony the parties have submitted in contest of the summary judgment motion, this court concludes that there is evidence from which a reasonable juror could conclude that Pankoke used excessive force and acted unreasonably in restraining Bromwell while arresting her. Accordingly, as explained in greater detail below, the court will DENY the Defendant's Motion for Summary Judgment (ECF No. 15).

---

[1] Bromwell misspelled Pankoke's name as "Pancoke" in her Complaint and in subsequent filings. Compl. (ECF No. 1); Pl.'s Br. (ECF No. 17). His name is correctly spelled in this Opinion and Order. See Answer (ECF No. 6). Pankoke makes no argument he has been haled into court on the basis of a misidentification. Accordingly, the court DIRECTS the clerk to correct Defendant's name on the court's docket.

# I. FACTUAL AND PROCEDURAL HISTORY

This opinion recites the facts as alleged by both parties, resolving any differences in their allegations in favor of Bromwell as the non-moving party. Reeves v. Sanderson Plumbing Prod., 530 U.S. 133, 150 (2000). On the evening of June 11, 2015, Bromwell stayed the night with a coworker at his home in Poquoson, Virginia. Bromwell Dep. at 13 (ECF No. 16-3). She stayed at her coworker's home throughout the next day. Id. at 13-14. During the day of June 12, 2015, Bromwell estimated she consumed 12 to 15 beers. Id. at 14. Late in the day, a dispute arose between Bromwell, her coworker and his friends. Id.

Pankoke offered testimony from one of the residents of the home who said Bromwell refused to leave when asked and scratched and bit at the residents when the residents removed her by force. Trial Tr. at 33 (ECF No. 16-1). The same witness said Bromwell broke a window from outside the home after having been removed. Id.

Bromwell described the dispute differently:

> I wanted to leave and the one resident didn't want me to leave. Then when I left, I came back. I had left my purse and he wouldn't give me my purse and that is where the big argument began. . . . I left [the trailer]. I walked out. And then I started to—I started down the driveway and realized I left my purse. And when I came back, I banged on the door and said I needed my purse and he said, "No. You wanted to leave. You are not coming back in." And I was banging on the door saying I need my purse.

Bromwell Dep. at 15 (ECF No. 16-3). When asked if she tried to force her way into the home, she said, "No." Id. When asked if she had broken a window, she said, "No." Id. She said she left the home "voluntarily." Id.

During the dispute, the Poquoson Police Department was called to investigate the disturbance. When Pankoke arrived, Bromwell was sitting in a chair outside the house. Pankoke Dep. at 18 (ECF No. 16-4). Pankoke left her there and spoke to the residents of the home, who

2

told him she had been disruptive, refused to leave the home, and that they had to remove her. Id. at 19. Pankoke returned to Bromwell, who was by then receiving first aid for an injury to her foot from paramedics who had also responded to the call. Id. After having spoken with the residents, Pankoke decided to arrest Bromwell for misdemeanor public drunkenness and destruction of property. Id. at 21-22.

Pankoke testified that, after he took her from the paramedics, Bromwell "was screaming and carrying on and yelling." Id. at 23. He was able to put her in handcuffs. Id. at 9. When he brought her to his patrol car, he instructed her to lean up against the trunk of the car, which she did, still in handcuffs. Id. at 8. While she was leaning against the car, Pankoke testified that Bromwell kicked him. Id. at 9. Pankoke testified that, after she kicked him, he told her to stop and she continued, so he "took her to the ground." Id.

Again, Bromwell offers a different version of the events. She testified she was handcuffed immediately when the police arrived and that she cooperated with Pankoke throughout her interactions with him before he "smashed" her to the ground. Bromwell Dep. at 16-17 (ECF No. 16-3). She testified she was cooperative, spoke calmly, and did not struggle with Pankoke. Id. She testified she did not kick Pankoke while he had her leaned against the trunk of his police car in handcuffs. Id. at 17.

Bromwell also offered testimony from a neighbor named Walter Battaglia, who saw Pankoke force Bromwell to the ground. Battaglia described the takedown consistently with Bromwell's version: "The officer slammed her brutally. . . . He picked her up like she was nothing, and he just slammed her right on her face. . . . You could hear the impact." Trial Tr. at 7 (ECF No. 16-2). Battaglia – who does not know Bromwell – testified he was about 40 feet from Bromwell and Pankoke with an unobstructed view of them. He testified he neither heard

3

her make any sounds nor did he see her strike or do anything to Pankoke prior to her being "slammed" to the ground. Id. at 8-9. Although Pankoke testified that he told Bromwell to stop kicking him, Battaglia denies that he did so.[2] Mrs. Chantielle Battaglia also testified that she witnessed Bromwell "getting arrested and the cop slamming her to the ground." Trial Tr. at 20 (ECF No. 16-2). Like her husband, Mrs. Battaglia did not see Bromwell kick or make any contact with Pankoke and did not hear the officer purportedly telling her to stop kicking him. Id.

Bromwell is five feet and three inches tall and weighs approximately 140 to 150 pounds. Bromwell Dep. at 24 (ECF No. 16-3). At the time of the incident she was barefoot. Trial Tr. at 42 (ECF No. 16-1). Pankoke is six feet and one inch tall and weighs approximately 270 pounds. Pankoke Dep. at 8 (ECF No. 16-4).

After forcing Bromwell to the ground, Pankoke recognized that he had injured her and had the paramedics who were still on the scene transport her to the hospital for medical treatment. Pankoke Dep. at 23 (ECF No. 16-4). She was diagnosed with lacerations to the forehead and face, a black eye and head trauma, and a closed head injury. Ex. 1 to Bromwell Dep. (ECF No. 16-3). Bromwell testified that she was concussed, vomiting and dizzy and that her wounds had to be sutured. Bromwell Dep. at 18.

Bromwell was later charged with assault and battery of a law enforcement officer for allegedly kicking Pankoke. After a trial at which she pled not guilty, she was convicted of misdemeanor obstruction of justice. Trial Tr. at 33 (ECF No. 16-2). In June 2017, she brought this action against Pankoke.

---

[2] During his examination at trial the prosecutor asked Battaglia if he heard the officer tell Bromwell to stop kicking him. Battaglia stated "That didn't happen." Trial Tr. at 11 (ECF No. 16-2).

4

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-25. When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves, 530 U.S. at 150; see also Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## III. ANALYSIS

Pankoke seeks summary judgment on all of Bromwell's claims: use of excessive force in violation of her rights under the Fourth Amendment, a violation of her rights to substantive due process under the Fourteenth Amendment, gross negligence, and common law assault and battery. He argues that Bromwell has not identified evidence from which a reasonable finder of fact could conclude that he used excessive force to restrain her in violation of her constitutional rights. He also argues he is entitled to qualified immunity from her constitutional claims because she has not identified evidence from which a reasonable finder of fact could conclude that it would have been apparent to a reasonable officer that his use of force was excessive.

Taken in the light most favorable to Bromwell as the non-moving party, there is ample evidence before the court to raise a dispute as to the material facts precluding qualified immunity for Pankoke's actions and the injuries he inflicted upon Bromwell while arresting her. Because the rights asserted arise under the Fourth Amendment's prohibition of unreasonable seizures, and not the Fourteenth Amendment's due process clause, Pankoke's motion will be granted as to any Fourteenth Amendment claims and otherwise denied.

a. Qualified Immunity

When considering an assertion of qualified immunity against claims of excessive force in violation of a person's constitutional rights, a court assesses a defendant's actions in two steps. Jones v. Buchanan, 325 F.3d 520, 526 (4th Cir. 2003) (citing Saucier v. Katz, 533 U.S. 194, 200 (2001)). The court first determines whether the facts, when viewed most favorably to the plaintiff as the non-moving party, support the conclusion that the defendant officer violated one of the plaintiff's constitutional rights. Id. (citing Saucier, 533 U.S. at 201). "If no constitutional right would have been violated," even when the facts are viewed in the best light for the injured

plaintiff, the analysis ends; the plaintiff cannot prevail. See Saucier, 533 U.S. at 201. Second, if there has been a potential violation of a constitutional right, "the next . . . step[3] is to ask whether the right was clearly established" at the time of the events at issue. Id. If not, the officer is immune from trial on the plaintiff's claims. Id. Therefore, in order for Bromwell's constitutional claims to survive summary judgment, (1) there must be evidence before the court from which a fact finder could conclude Pankoke violated one of her constitutional rights, and (2) that right must have been clearly established at the time of her injuries, June 12, 2015.

A person's right under the Fourth Amendment to be free from unreasonable seizures by government officers can be violated by the excessive use of force in the conduct of that seizure.[4] See Graham v. Connor, 490 U.S. 386, 395 (1989); Jones, 325 F.3d at 527-28. The court is obliged to consider whether an officer's use of force was unreasonable from an objective point of view, which is to say, the court considers the situation "from the perspective of a reasonable officer on the scene," and not with the "20/20 vision of hindsight." Graham, 490 U.S. at 396-97. This accommodates the difficulty police officers encounter when they are "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." Id. The court does not consider the officer's intent, only his actual conduct in the light of the totality of the circumstances. Tennessee v. Garner, 471 U.S. 1, 8-9 (1985); Jones, 325 F.3d at 527 (citing Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996)). The ultimate question is "whether a

---

[3] Saucier prescribed that the two steps happen in sequence—i.e. that a must court consider whether a constitutional violation occurred before addressing whether the purportedly right violated was clearly established at the time of the violation. Saucier, 533 U.S. at 201. The Supreme Court has since adjusted this standard: now, either prong may be considered first as appropriate in a given case. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

[4] Bromwell also claimed a violation of her Fourteenth Amendment right to substantive due process. Compl. (ECF No. 1). It is, however, well established that claims of excessive force occurring during an arrest implicate the Fourth Amendment's "objective reasonableness" test. Graham v. Connor, 490 U.S. 386, 388 (1989). The due process clause of the Fourteenth Amendment applies to pretrial detainees after a completed arrest but before a formal adjudication of guilt. Wiggins v. Quesenberry, 222 F. Supp. 3d 490, 498–99 n. 6 (E.D. Va. 2016). In this case, all of Bromwell's complaints relate to Pankoke's actions in close temporal proximity to her arrest. Id. n.6. As a result, the Defendant's motion for summary judgment on Bromwell's Fourteenth Amendment claims will be granted.

reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliott, 99 F.3d at 642 (quoting Graham, 490 U.S. at 396-97). This analysis is highly fact-bound and considers (1) the seriousness of the crime that led to the arrest, (2) whether the suspect was an immediate threat to the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to flee. The severity of the injuries sustained because of the officer's actions is also a "relevant factor." Jones, 325 F.3d at 527 (citing Graham, 490 U.S. at 396-97; Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994); Pressly v. Gregory, 831 F.2d 514, 517 (4th Cir. 1987)).

All of the crimes Bromwell was suspected of having committed were misdemeanors,[5] and none involved any allegation of injury or violence to any person. As a result, the first factor does not support a significant use of force. Smith v. Ray, 855 F. Supp. 2d 569, 579 (denying qualified immunity for conduct during arrest of suspect believed to be contributing to the delinquency of a minor); Rowland, 41 F.3d at 171 (affirming denial of qualified immunity for officer's arrest of suspect over a lost five dollar bill). Pankoke did identify one case in which a similar misdemeanor arrest justified a significant use of force—when considered along with the other factors in the Graham analysis. Thomas v. Holly, 533 F. App'x 208, 216 (4th Cir. 2013) (considering North Carolina's misdemeanor destruction of property law). But Thomas involved an encounter between two equally sized men, in which the arrestee actively and combatively resisted arrest. The Fourth Circuit approved the officer's tackling and tasing the Defendant in order to gain control and place him in handcuffs, but denied qualified immunity for the plaintiff's claimed use of force employed after the Defendant was restrained. In this case there is no

---

[5] Public drunkenness is a Class 4 misdemeanor in Virginia. Va. Code § 18.2-388. Destruction of the window would likely have been either a Class 1 misdemeanor or lower, assuming the value of the window was less than $1000. Va. Code § 18.2-137.

dispute that Bromwell was handcuffed without incident, and all of the force employed occurred after she was so-restrained.

Bromwell also posed no immediate threat to the safety of Pankoke or others. Pankoke suggests that Bromwell posed an immediate threat because the call that brought him out to the house was for a disturbance and destruction of property and because the residents of the home told him that it took three of them to remove her from the home. Def.'s Mem. at 13 (ECF No. 16). But this argument entirely ignores the evidence in the record that Bromwell had been completely compliant and civil with him and with the paramedics present at the scene. See Bromwell Dep. at 16-17 (ECF No. 16-3); Trial Tr. at 43 (ECF No. 16-1). Additionally, it is undisputed that, at the time he decided to force her to the ground, Pankoke already had Bromwell restrained in handcuffs, and bent over the trunk of his police car. Bromwell Dep. at 17 (ECF No. 16-3); Pankoke Dep. at 8-9 (ECF No. 16-4). Finally, Bromwell was barefoot, not armed, and Pankoke had significant physical advantages, almost 10 inches of height and more than 120 pounds of weight. Bromwell Dep. at 24 (ECF No. 16-3); Pankoke Dep. at 8 (ECF No. 16-4). See Jones v. Buchanan, 325 F.3d at 529 (denying qualified immunity in part because the plaintiff against whom he used force was handcuffed, unarmed, and physically unable to harm officer or anyone else); Kane v. Hargis, 987 F.2d 1005 (4th Cir. 1993) (holding a 200-pound officer acted unreasonably by punching a 100- pound suspect repeatedly in the face after he had already restrained her by sitting on her). Most importantly, Pankoke had already secured Bromwell in handcuffs with her hands behind her back. All of these facts viewed in the light most favorable to Bromwell suggest she posed little threat to Pankoke when he decided to force her to the ground.

With regard to the third factor, viewing the evidence in the light most favorable to Bromwell, she was not actively resisting arrest or attempting to flee when Pankoke forced her to the ground. Pankoke offers evidence that Bromwell was "screaming," refusing to comply with his commands, and allegedly kicked him immediately before he forced her down. Pankoke Deposition at 11, 16, 23 (ECF No. 16-4). He goes so far as to propose to the court that, "it is undisputed that [Bromwell] resisted arrest throughout the duration of the encounter." Def.'s Mem. at 13 (ECF No. 16). But this is far from undisputed. In fact, during her deposition, Bromwell testified that, immediately before Pankoke forced her down, she spoke calmly and was not struggling with him. Bromwell Dep. at 16-17 (ECF No. 16-3). She testified that she did not kick him. Id. at 17. Additionally, Mr. Battaglia testified during Bromwell's criminal trial he saw her make no move or sound that could have provoked Pankoke's takedown. Although Mrs. Battaglia acknowledged that Bromwell made a "jerking motion," she stated she did not see any kicking or hear any command to stop kicking before witnessing Pankoke "picking her up and slamming her." Trial Tr. at 20 (ECF No. 16-2). When viewed in the light most favorable to Bromwell, this evidence supports the conclusion that she was neither resisting arrest nor attempting to flee when Pankoke executed the take down.

In the Fourth Circuit, the extent of the injuries Bromwell sustained is also "a relevant factor." Jones, 325 F.3d at 527. Pankoke admits Bromwell's injuries are "more than de minimis." Def.'s Mem. at 14 (ECF No. 16). He follows that acknowledgment with a puzzling observation that her "injuries are not greater than would be expected if [she] had simply stumbled and fallen to the ground during the course of resisting Officer Pankoke." Id. This speculation is the entire analysis of whether the extent of Bromwell's injuries recommends

finding that her constitutional right was violated to be free from excessive force during an arrest. Id.

Bromwell has submitted photos that purport to show her condition after her interaction with Pankoke. The photos reveal cuts on her face as well as severe swelling and bruising around her eye. Photos, ex. 2 to Pl.'s Mem. (ECF No. 17-2). She reported, and her medical records confirm, she received lacerations to her head and face requiring sutures, a black eye, and a closed head injury resulting in a CT scan. Ex. 1 to Bromwell Dep. (ECF No. 16-3). Pankoke himself recognized he injured her severely enough to warrant immediate medical attention from the paramedics who were on the scene. Pankoke Dep. at 23 (ECF No. 16-4). Bromwell's injuries are sufficiently severe to suggest an unreasonable use of force precluding qualified immunity. Jones v. Buchanan, 325 F.3d at 530-31 (denying qualified immunity where plaintiff suffered "a nose crushed into numerous pieces, lacerations of the nose and lips, each requiring multiple sutures, and bruised ribs"). Smith v. Ray, 855 F. Supp. 2d 569, 580 (E.D. Va. 2012) (denying qualified immunity when officer punched smaller female suspected of harboring a minor, cracking her rib); Veney v. Ojeda, 321 F. Supp. 2d 733, 743-44 (E.D. Va. 2004) (no qualified immunity for officer when passenger during traffic stop was thrown to the ground resulting in hand swelling).

Pankoke proposes several cases that he argues require the court to grant him summary judgment on the basis of qualified immunity. However, all are distinguishable.

In most of these cases, qualified immunity was available for officers who used significant force in attempting to restrain suspects who were trying to flee, defying the officers' orders, or otherwise resisting arrest. Thomas v. Holly, 533 F. App'x 208, 216-21 (4th Cir 2013); Redding v. Boulware, 501 F. App'x 238, 242 (4th Cir. 2012); Brown v. Gilmore, 278 F.3d 362, 369 (4th

Cir. 2002); Anderson v. Rodriguez, No. 1:14cv1149, 2016 WL 8732311, at *5 (E.D. Va. June 3, 2016); Geba v. Norris, No. 2:14cv612, 2016 WL 8730898, at *5 (E.D. Va. Apr. 4, 2016). In the present case, unlike those cited, it is actually undisputed that Bromwell willingly submitted to handcuffs and was already in handcuffs, leaned against the trunk of Pankoke's vehicle at the time of the take down. Moreover, accepting the facts in the light most favorable to Bromwell, she was also complying with Pankoke's instructions, and making no effort to resist arrest.

When the evidence is considered in the light most favorable to Bromwell, all of the factors lead to the conclusion that reasonable jurors could find Pankoke employed excessive force in restraining Bromwell on June 12, 2015. As a result, Bromwell has identified sufficient evidence to support the conclusion that Pankoke violated her constitutional rights.

What remains is to determine whether Pankoke was "on notice" that his conduct was unlawful. Jones, 325 F.3d at 531 (quoting Hope v. Pelzer, 536 U.S. 730 (2002)). "The standard is again one of objective reasonableness: the 'salient question' is whether 'the state of the law' at the time of the events at issue gave the officer 'fair warning' that his alleged treatment of the plaintiff was unconstitutional." Id. (quoting Hope, 536 U.S. at 738-42). Pankoke has not even argued this second point. The law prohibiting the use of excessive force when conducting an arrest was clearly established prior to June 12, 2015. Thomas v. Holly, 533 F. App'x 208, 219 (4th Cir. 2013) (citing Tennessee v. Garner, 471 U.S. 1, 11 (1985)). Any reasonable law enforcement officer in Pankoke's position would have known that, by applying so much force in his takedown, he was violating Bromwell's constitutional right to be free from excessive force during arrest. Smith v. Ray, 855 F. Supp. 2d at 582-83; Veney, 321 F. Supp. 2d at 746. Accordingly, Pankoke's motion for summary judgment on the basis of qualified immunity will be denied.

b.   Claims for Assault and Battery

Pankoke argues that "[i]n order to sustain her common law tort claims, the Plaintiff must prove that the actions of Officer Pankoke were not objectively reasonable under the circumstances presented at the time of the incident. He claims his actions were justified and reasonable under the Fourth Amendment Analysis, and as a result, Bromwell's tort claims fail as well. Def.'s Mem. at 21 (ECF No. 16). As the court has explained above, for the purposes of opposing the summary judgment motion, Bromwell has shown that reasonable jurors could conclude Pankoke's use of force in taking her to the ground was unreasonable, and her claims for assault and battery may proceed.

Bromwell's assault and battery claims—and Pankoke's possible entitlement to immunity due to his status as a law enforcement officer—are governed by state law. See Gray-Hopkins v. Prince George's County, 309 F.3d 224, 232 (4th Cir. 2002). A battery under Virginia law is "an unwanted touching which is neither consented to, excused, nor justified." Koffman v. Garnett, 574 S.E.2d 258, 261 (Va. 2003) (citations omitted). An assault is "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact and that creates in that other person's mind a reasonable apprehension of an imminent battery." Id. (citing Restatement (second) of Torts § 21 (1965)).

A police officer enjoys "special protection" from tort liability when he is performing his duties in a lawful manner: "in making an arrest under lawful authority . . . (an) officer is within reasonable limits the judge of the force necessary under the circumstances, and he cannot be found guilty of any wrong, unless he arbitrarily abuses the power conferred upon him. Parker v. McCoy, 188 S.E.2d 222, 226 (Va. 1972) (citing Davidson v. Allam, 130 S.E. 245, 248 (Va. 1925)). Consequently, to succeed on assault and battery claims against a law enforcement

officer, a plaintiff must prove "a wrongful act;" that is, that the law enforcement officer's conduct lacked "justification or excuse." McLenagan v. Karnes, 27 F.3d 1002, 1009 (4th Cir. 1994) (citing Pike v. Eubank, 90 S.E.2d 821, 827 (Va. 1956).

Although state-law tort liability and federal excessive force violations operate under two independent standards, those standards largely overlap. State-law claims that arise from the officer's use of force, such as battery, are "subsumed within the federal excessive force claim." Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994). As a result, state-law tort claims will usually fail or proceed with the federal excessive force violation if the standards of qualified immunity are met or not met respectively. See Thompson v. Commonwealth of Virginia, 878 F.3d 89, 111 (4th Cir. 2017) (denying qualified immunity and reversing the district court's dismissal of state-law claims); Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) (rejecting officers' qualified immunity and "functionally identical" state immunity); Bailey v. Kennedy, 349 F.3d 731, 745 (4th Cir. 2003) ("For the same reasons that we affirm the denial of qualified immunity on the § 1983 excessive force claim, we affirm the denial of public officers' immunity on the state common law assault and battery claim."). Because Bromwell has produced evidence sufficient for a finder of fact to conclude that Pankoke's conduct during the incident on June 12, 2015, was objectively unreasonable, Pankoke's justification defense to the battery charge is also an issue for the jury. The state law claims for assault and battery will therefore proceed along with Bromwell's constitutional claim of excessive force.

c.  Gross Negligence

A claim for gross negligence requires an injury that occurred out of the utter disregard of prudence amounting to complete neglect of the safety of another. It is a "heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight

14

diligence, or the want of even scant care." Burns v. Gagnon, 727 S.E.2d 634, 647 (Va. 2012) (quoting Volpe v. City of Lexington, 708 S.E.2d 824, 829 (Va. 2011)). Pankoke has argued that the claims against him are not sufficient for any reasonable juror to conclude he was grossly negligent.

In Koffman v. Garnett, a claim for gross negligence was permitted to proceed over claims of sovereign immunity against a middle school football coach named Garnett who injured a player named Andy by tackling him during training. 574 S.E.2d 258, 260 (Va. 2003). The Supreme Court of Virginia described the circumstances:

> Garnett ordered Andy to hold a football and "stand upright and motionless" so that Garnett could explain the proper tackling technique to the defensive players. Then Garnett, without further warning, thrust his arms around Andy's body, lifted him "off his feet by two feet or more," and "slamm[ed]" him to the ground. Andy weighed 144 pounds, while Garnett weighed approximately 260 pounds. The force of the tackle broke the humerus bone in Andy's left arm.

Relying in part on the coach's significant size advantage, "his instruction implying that Andy was not to take any action to defend himself, [and] the force he used during the tackle," the Court held that a reasonable person could conclude the coach's actions were imprudent and were taken in utter disregard for the safety of the player involved. Id. at 259-60.

The facts in Bromwell's case show many similarities to those surrounding the injury in Koffman. Again, accepting the facts in the light most favorable to Bromwell, she was entirely at Pankoke's mercy before he "slammed" her to the ground. She is small relative to Pankoke. She was restrained by handcuffs behind her back, and thus unable to protect her head or face during the take down. She was also impaired by alcohol, with her back to Pankoke at the time of the take down. And, accepting her evidence, she received no warning prior to the maneuver. Although Pankoke argues that his actions were intended to prevent Bromwell from hurting herself by falling, a reasonable juror hearing that . . . "He picked her up like she was nothing, and

15

he just slammed her right on her face" . . . Trial Tr. at 7 (ECF No. 16-2) could conclude that his actions demonstrated an "utter disregard of prudence amounting to complete neglect of the safety of another." Burns, 727 S.E.2d at 647; See also Veney, 321 F. Supp. 2d at 747. Her claim of gross negligence will survive summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Pankoke's Motion for Summary Judgment (ECF NO. 15) is GRANTED IN PART solely as to Bromwell's claim for relief under § 1983 for an alleged violation of her rights under the 14th Amendment. The Motion is otherwise DENIED.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

July 25, 2018